# Bear's Estate.

1. To make the separate estate of a married woman liable for a debt con-
tracted during coverture, all that is required is that the claim shall be for
necessaries for the support and maintenance of her family, that they were
contracted for by her or in her name by some one authorized by her, and that
her husband was insolvent.

2. Fraud is not to be presumed without satisfactory proof of its existence;
which can scarcely be affirmed where a proper motive exists, which might
have been as readily the operating motive, as one that was fraudulent.

3. Chamberlain purchased from Bear his interest in his wife's estate, upon
condition that out of the proceeds Bear would pay back the amount of a debt
due by him to Chamberlain; Bear having communicated to Chamberlain his
expectation that his interest would be attached by creditors, and that some-
thing would have to be done to save it from attachment: *Held*, that, Cham-
berlain's purchase, being found to be ancillary to the main object of saving
his debt, and not being fraudulent in actual intent, is not to be tortured into
a fraud without satisfactory evidence of a positive intent to collude with
Bear to hinder and delay creditors.

January 23d 1869. Before THOMPSON, C. J., AGNEW and
SHARSWOOD, JJ. READ, J., absent. WILLIAMS, J., at Nisi
Prius.

Appeal from the Orphans' Court of *Chester county* : No. 291,
to January Term 1869.

The proceedings in the court below were upon the distribution
of the balance in the hands of Samuel W. Slocum, administrator,
&c., of Louisa Bear, deceased.

Louisa Bear, who was the wife of Martin Bear, died December
20th 1866, intestate, leaving to survive her, her husband and two
minor children, of whom Jonas Chamberlain is the guardian.

The account of the administrator was confirmed June 9th 1868,
showing in his hands a balance of $2162.18, due the estate. Joseph
Hemphill, Esq., was appointed auditor to distribute the balance.

On the 24th of December 1866, Bear assigned to Jonas Cham-
berlain all his interest in the estate of decedent. On the 27th of

[Bear's Estate.]

December 1866, attachment executions at the suit of John G. Freeland for $274.64, and the executors, &c., of John D. Wilson, deceased, for $316.71, and on the 26th of February 1867, one for $1420.66 at the suit of George Trimble against Martin Bear, were served on the administrator.

Before the auditor a number of claims of alleged indebtedness were made against the estate. The only one now involved in these appeals was that of McCanna & Laverty.

The questions were, is the assignment to Chamberlain void under the Statute of 13 Elizabeth, and is the claim of McCanna & Laverty, a debt for which the wife was liable under the Act of 1848.

The auditor reported that Martin Bear made an assignment for the benefit of his creditors in 1860, and has ever since been insolvent; that notwithstanding his insolvency he carried on business for two years from April 4th 1864, as a hotel-keeper at Penningtonville, the license being taken out in his own name; that a number of claims, which he enumerates, were presented, amongst which was "McCanna & Laverty, store goods $97.40;" that this is "the only bill satisfactorily proven to the auditor as being for necessaries and contracted by the intestate—the amount due upon which up to the death of the intestate is $97.40," and that it is "legally entitled, under the evidence, to payment out of the fund for distribution under the Act of April 11th 1848."

The auditor, under the rules of the Orphans' Court, reported the evidence taken by him. By this it appeared that the account commenced April 12th 1865, and ran until December 21st 1866, inclusive, being the day after the wife's death; it amounted to $216.98, reduced by credits to $97.40.

McCanna & Laverty kept store in Penningtonville, where Bear had lived about five years, keeping tavern there from April 1st 1864 to April 1st 1866 in his own name. He testified that the account was contracted by both himself and wife, and was for "necessaries in the house." He was insolvent and she had the credit, and therefore anything that was got there was charged to her—she went and bought as long as she was living. She sent the children, and sometimes Bear went; "she was aware the account was kept against her." Bear had been dealing with McCanna four or five years—had paid him part of his account and still owed him. "These goods went into use in (his) family."

"The dealing commenced in the first place by our going to the store and getting what was wanted without saying anything how it was to be charged. I don't know that any change was ever made afterwards." He made some payments out of his own funds when at the tavern, and bought pigs, liquor, hay, &c., and hired the servants; bought beef and flour after he left the tavern; his wife bought flour when he was not about; he borrowed money

from his wife which he paid back from money he got from keeping tavern. The wife owned the tavern property; her capital was used in the business; the goods were hers.

As to Bear's assignment to Chamberlain, the auditor reported: —On Monday morning (December 24th 1864), after the wife's death, Bear went to Chamberlain, to whom he owed $200 or $300, and told him if he would give him $800 for his share of his wife's estate, "he would pay him what he owed him back." Bear said that if he (Bear) did not do it, somebody would attach it; he knew something would have to be done to save this money from attachment. Chamberlain, after considering awhile, agreed to do it. They went to Lancaster city that day to an attorney's office, where the assignment was prepared, executed and delivered, Chamberlain paying Bear the $800 in the office; they then went to a hotel together, where Bear paid Chamberlain what he owed him. With what was left, Bear paid some little debts, and had himself and children to keep. The auditor reports no other facts on this point. On the day but one after his wife's death, Bear went to Esquire Rambo and asked him if it would be lawful for him to assign his interest in his wife's estate. Rambo would give no opinion, but advised him to ask a lawyer. He told Rambo that he wanted to secure the money for his own use, and told him that he owed creditors, and he was sure they would attach it, and he would try to secure it. He afterwards saw Rambo, and said that he (Bear) and Chamberlain had dealings, and he believed he would assign to him, &c.

Bear testified that as he had no money, he concluded that something like assigning his interest would have to be done, and went early Monday morning to see Chamberlain, and entered into the arrangement reported by the auditor. He also made a statement of the nature of his indebtedness, but could not give particulars or specify amount, or state the aggregate amount paid, nearer than that it was between $200 and $300. At Lancaster, Chamberlain brought no books and did not give him the items. Bear had no account of the debt. Some part was more than six years' standing. Chamberlain had never asked him for the money; had said he would not push him or put him to any trouble. Chamberlain gave him no receipt for the money. Bear did not ask for one. He gave as the reason why Chamberlain paid him the whole $800, and they went to another place to pay Chamberlain, that that was the understanding. He "wanted it done without any fuss or excitement about Penningtonville about it."

The auditor further reported: "In this case the auditor is satisfied that Martin Bear was justly indebted to Jonas Chamberlain for $200 to $300, and that for the purpose of securing his creditor, who had often befriended him in his pecuniary difficulties, he was willing that he should have the first opportunity of pur-

[Bear's Estate.]

chasing his (Martin's) interest in his wife's estate. He made the offer to sell to him for $800, which was at least $500 more than the debt due, stating at the time his motive for so doing, to wit: that he expected attachments would be issued by other creditors.

"Now, there can be no doubt that if Martin Bear had been indebted to Jonas Chamberlain in the sum of $800, and had paid it by a transfer of his interest in his wife's estate of that value or less, the transaction could not be impeached.

"Then, does the fact that the consideration for the assignment was greater than the debt, vary the law of the case? In other words, does the fact that Martin Bear received $500 more than the debt due J. Chamberlain destroy the validity of the assignment, and make it void?

"The auditor thinks not. So far as appears, there was a bonâ fide sale by Bear to Chamberlain of a vested interest in the estate of his wife. At the time of its transfer, Martin Bear was the legal owner thereof, and had a legal right to the sale of it for a fair price to whom he pleased. He sold it for $800, which is, as it turns out, more than its real value, the whole estate being, after payment of the expenses of the administrator, $2162.18, which is reduced by this report, by debts and expenses of audit, to $1954.12, giving to Jonas Chamberlain $651.37⅓, being a loss to him by the purchase of $148.63.

"Then comes the inquiry, does the fact that Martin stated to Jonas that attachments would be issued by some of his creditors, none having been served or issued up to that time, make void the assignment?

"It is well settled, 'That there is no doubt but that a debtor may openly prefer one creditor to the rest, and transfer property to him, even after the others have commenced their actions:' see 1 Smith's Lead. Cas. 12; Notes to Twyne's Case, and authorities there cited. See also Fulweiler v. Hughes, 5 Harris 445.

"There is no evidence that Jonas Chamberlain joined in a conspiracy to cheat the other creditors of Martin, unless the fact that he was desirous of securing his own debt be such. But it is not. It was a race between creditors, and Jonas made the purchase before the attaching creditors had moved; he made it not to hinder, delay and defraud the other creditors, but to secure his own debt, taking the risk of a good or bad bargain. Where there is evidence to sustain a justifiable motive, we cannot, without evidence, suspect and act upon one that is illegal. Although he knew of Martin's belief that other creditors would move, does that knowledge tie his hands and deprive him of his right to secure himself by the purchase? The auditor thinks not. Again, the statute 13 Elizabeth does not render void a conveyance made by a man, simply because he is indebted: 3 Penna. R. 160. If it did, then no man could safely buy of an insolvent or one much

10 P. F. SMITH—28

indebted. To make the assignment in the present case void, the evidence should satisfy the mind that the intent or purpose of the parties was to 'delay, hinder and defraud creditors, &c., of their just and lawful actions, suits, debts, &c.' There is no evidence that Jonas Chamberlain knew anything of the purposes of the other creditors, except what he learned from Martin, and that only amounted to an expectation on Martin's part, that some of his creditors would issue attachments. Does the expression of such a belief by Martin involve Jonas in something of the nature of a criminal conspiracy, to wrong the other creditors, in violation of the Statute of Frauds? He said nothing, he did nothing by way of encouraging such a purpose, and why he should be visited with loss for the exercise of a proper vigilance in securing his debt, the auditor cannot conceive, and he is therefore of opinion, that his motive of action being legal, the assignment is not void, and that having paid a bonâ fide price for the interest conveyed, the fact that there was some $500 in the hands of Martin after the liquidation of the debt does not invalidate the transaction, there being no evidence that the assignee had any interest in the money he had paid by any arrangement with the assignee. In these views the auditor believes he is fully sustained by the law, as expressed by the Supreme Court in Covanhovan v. Hart, 9 Harris 500.

"The assignment is therefore sustained, and the fund is distributed by giving to the creditors of Louisa Bear, who have legally sustained them, their claims, as before stated, deducting them and the costs of this audit from the fund and of the balance, giving one-third thereof to Jonas Chamberlain in his own right as assignee, &c., one-third to him as guardian of Martin Bear, Jr., and the other third to him also as guardian of Mary A. Bear, the minor children of the decedent."

The auditor accordingly deducted from the balance in the hands of the administrator the expenses of the audit and the claims of McCanna & Laverty and others, and awarded the balance to Chamberlain, one-third in his own right as assignee, and two-thirds as the guardian of the minors.

Upon exceptions the court below confirmed the report of the auditor as to the questions arising upon the claim of McCanna & Laverty and the validity of the assignment of Bear to Chamberlain.

From this decree an appeal was taken by Wilson's executors, Freeland and Trimble; they assigned for error the decree of the court.

*George F. Smith* and *P. Frazer Smith* (with whom was *R. E. Monaghan*), for appellants, cited Act of April 11th 1848, § 8, Purd. 700, pl. 13; Murray v. Keyes, 11 Casey 384; Mahon v. Gormley, 12 Harris 80; Bear v. Bear, 9 Casey 525; Williams v. Coward, 1 Grant 21; Franklin v. Rush, 1 Phil. R. 571; Mani-

[Bear's Estate.]

fold's Estate, 5 W & S. 340; Chew's Appeal, 9 Wright 230; Parke v. Kleeber, 1 Id. 250.

Stat. 13 Eliz. ch. 5; Roberts' Dig. 395; Purd. 1025, Act of July 12th 1842, Purd. 36 pl. 52; Act of June 13th 1836, Pamph. L. 739; Act of March 31th 1860, Purd. 239, pl. 139; Covanhovan v. Hart, 9 Harris 500; Passmore v. Eldridge, 12 S. & R. 198; Geiger v. Welsh, 1 Rawle 353; McCulloch v. Hutchinson, 7 Watts 434; Twyne's Case, 3 Reports 80 (1 Sm. Lead. Cases 2 and notes); Cadogan v. Kennett, Cowp. 432; Roberts on Fraudulent Conveyances 490; Drum v. Painter, 3 Casey 150; Wilt v. Franklin, 1 Binn. 523; Moyer v. Schick, 3 Barr 247; Bunn v. Ahl, 5 Casey 391; McKee v. Gilchrist, 3 Watts 233, 234; Whiting v. Johnson, 11 S. &. R. 329; Kepner v. Burkhart, 5 Barr 478; Zerbe v. Miller, 4 Harris 497; Mateer v. Hissim, 3 Penna. R. 164.

*W. Darlington*, for Jonas Chamberlain, appellee.

*Joseph Hemphill, Jr.*, for McCanna & Laverty, appellees.

The opinion of the court was delivered, February 4th 1869, by AGNEW, J.—The claim in this case against the estate of Louisa Bear arose upon a distribution in the Orphans' Court, and not in an action to recover the sum. We have therefore no question of pleading or of averment to meet. All that is required is that the claims shall be one for necessaries for the support and maintenance of her family—that they were contracted for by her or in her name by some one authorized by her to do so, and that her husband was insolvent: 11 Casey 384; 1 Wright 251. The auditor has found these facts. It is true he says for necessaries, omitting to say for the support and maintenance of her family; but on referring to the testimony brought up by the appellants, it clearly shows that the amount was for articles used in the maintenance of the family. Nor is it less clear to our minds upon a just construction of Martin Bear's testimony that the debt was contracted for these necessaries, in her name and by her authority. This assignment of error is not supported.

We think the other branch of the case was also well decided. There is no doubt that the assignment of Martin Bear to Jonas Chamberlain of his interest in the residue of his wife's estate was made upon a valuable consideration and for a full price. But it is supposed that the communication of Bear's expectation that if he kept it, his interest would be attached by other creditors, and that something would have to be done to save it from attachment, is such a fraud on part of both that the assignment is vitiated by it. The auditor finds as a fact that there was no fraudulent purpose on part of Chamberlain, and that *his* purpose was to be secured in

a debt which Bear owed him. We are not able to say that the testimony proves that this was a clear mistake on part of the auditor and of the court who confirmed his report. Chamberlain had a motive entirely adequate; to wit, the preservation of his own debt against Bear, who was insolvent. Fraud is not to be presumed without satisfactory proof of its existence; which can scarcely be affirmed, where a proper motive exists, which might have been as readily the operating motive as one that was fraudulent. As to Chamberlain's taking time to deliberate, it affords little or no proof of fraud. The nature of the interest, to wit, an unsettled balance of an estate in the course of administration, the law of its distribution, and the right passing under the assignment, were matters calculated to make any one hesitate, and to lead him to inquire how far he would be safe in advancing money upon it. Had Chamberlain's debt equalled the interest assigned, his motive to obtain it by putting aside other creditors would not have affected his title, according to Covanhovan *v.* Hart, 9 Harris 500. So here his purchase being found to be ancillary to the main object of saving his debt, and not being fraudulent in actual intent, will not be tortured into a fraud in the absence of satisfactory evidence disclosing a positive intent to collude with Bear to hinder and delay his creditors.

Decree affirmed.